IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | Criminal No. 1:08-CR-0041 |
| | : | |
| v. | : | |
| | : | JUDGE SYLVIA H. RAMBO |
| | : | |
| **OTIS MONTGOMERY** | : | |

**M E M O R A N D U M**

On December 12, 2007, agents from the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF") investigating a possible straw purchase of firearms extracted Defendant Otis Montgomery from his home at gunpoint, handcuffed him, and performed a nonconsensual and warrantless entry and search of his home. The encounter yielded both statements and physical evidence. Before the court is Montgomery's motion to suppress the physical evidence and statements that were the product of this seizure and search. For the reasons that follow, the motion will be granted.

I.  **Background**

   A.  **Procedural Background**

Montgomery was indicted by a grand jury on January 30, 2008. Count I of the indictment charges him with conspiracy to make false statements to ATF in the purchase and transfer of firearms to a convicted felon, in violation of 18 U.S.C. § 371. In Count II of the indictment, Montgomery is charged with knowingly making a false and fictitious written statement in the purchase of a firearm, in violation of 18 U.S.C. § 922(a)(6) and 924(a)(2), and § 2. In Count VI, Montgomery is charged with knowingly possessing a firearm shipped in interstate commerce while being an

unlawful user and addicted to a controlled substance in violation of 18 U.S.C. § 922(g)(3) and 924(a)(2).

On August 13, 2008, Montgomery filed a motion to suppress. (Doc. 30.) A brief in support thereof was filed the same day. (Doc. 31.) On October 8, 2008, the government filed a brief in opposition. (Doc. 47.) A hearing was held on October 16, 2008, at which the government presented testimony from three law enforcement officers. Accordingly, this matter is ripe for disposition.

### B.    Factual Findings

The facts, as presented at the hearing, are as follows:[1]

On December 7, a sales clerk at Gander Mountain, a sporting goods store, contacted ATF to report what he believed to be a suspicious purchase of three firearms. The purchaser, Defendant Otis Montgomery, had been accompanied by another individual, who looked at the firearms and handled them before Montgomery made the purchase. After interviewing the store clerk at Gander Mountain and reviewing surveillance tape of the transaction, ATF agent Ryan Kovach decided to interview Montgomery about the purchase. No further evidence was offered to explain why the firearms purchase was believed to be suspicious.

On December 12, 2007, at around 2:53 p.m., ATF agents went to Montgomery's apartment building located at 713 South George Street in York, Pennsylvania to interview him. The apartment building was a large house divided up into numerous apartments. At the front of the house was a wrap around front porch. An unlocked front door led to a small vestibule containing mailboxes. Beyond that was another locked door, which led to a large foyer with additional

---

[1] The facts are undisputed except where noted.

doors leading to separate apartments. There was a strong odor of burning marijuana in the air, but the agents could not determine its source at that time. The mailboxes in the vestibule were unmarked, and the agents were unable to locate Montgomery's apartment or contact him.

After about ten minutes, the agents headed back towards the parking lot in the rear of the building. At that point, they observed a black Lincoln Navigator pull into the parking lot. The officers decided to question the driver about Montgomery's location. The driver, Tristan Green, told police that he typically went into the vestibule and yelled "Yo Yo Yo" and Montgomery would open the door. At the request of the agents, Green escorted the agents to the vestibule and called for Montgomery, but received no response. At this point, however, the agents became suspicious of Green. According to the officers, Green seemed nervous and suspicious, and he held his arms tight to his hooded sweatshirt. Officer Guyer patted down Green and discovered a handgun in his front pocket. The gun was confiscated. The agents called for backup, and officers from the York City Police Department arrived. After a brief scuffle, Green was handcuffed and taken away to the York police station. At some point the officers learned that the gun's serial number matched that of one of the weapons purchased by Montgomery on December 7.

After Green was taken away, ATF agents remained on the premises for the next two hours and set up a perimeter. Neither a search warrant nor an arrest warrant was sought or obtained. According to the agents, they remained determined to interview Montgomery to find out whether he still possessed the firearms, or whether he had purchased them for someone else. At some point, ATF agents Sines

3

and Laprell entered the foyer after the owner of the apartment arrived home and unlocked the door for them.  Around 5:30 p.m., as Sines and Laprell were standing in the foyer, they heard a knock from the inside of the door of an apartment.  Agent Sines testified that the occupant of the apartment—later identified as Montgomery—said words to the effect of "I want to give up" or "I want to surrender."  The two agents drew their guns, and instructed Montgomery on how to exit the apartment.  Montgomery was immediately handcuffed with his hands behind his back.  The agents patted him down for weapons and contraband, and none was found.

       Sines and Laprell radioed Guyer and Kovach, who were in the back of the building.  They arrived at Montgomery's apartment soon after he had been handcuffed.  Montgomery was led away from his apartment door and detained by Guyer near the stairs.  Montgomery was told that he was not under arrest, though he remained in handcuffs and was not free to leave.  Guyer testified that he did not ask Montomery any questions during this detention.  Instead, Guyer testified that Montgomery asked him what was going on and what happened, noting that he had heard a scuffle outside.  Guyer told him that there had been a scuffle on the porch with one of Montgomery's friends.  Guyer testified that without prompting, Montgomery then stated that he knew what they were there for, and that the guns were on a shelf above the fireplace.  At this point neither Guyer nor any other agent had administered *Miranda* warnings, or requested Montgomery's consent to enter or search his apartment.

       Meanwhile, Montgomery's apartment door remained open.  The foyer was dark, the lights were off inside the apartment, the interior of the apartment was

hazy and smoky, and the odor of marijuana was strong. The agents were unable to discern any particular objects or individuals in the apartment at this time. Nevertheless, Kovach, Laprell, and Sines entered the apartment to perform what they described as a "protective sweep" for other potential "threats" in the apartment, such as other individuals with weapons. No other individuals were found, but the agents did find two handguns in cases on the shelves above the fireplace in the living room. The guns were two of the three firearms that Montgomery had purchased days earlier at Gander Mountain. Additionally, the agents found two cigarettes with marijuana residue, and some plastic baggies, some of which appeared to have marijuana residue inside. This is the physical evidence Montgomery now seeks to suppress.

After completing the search of the apartment, the agents returned to the hallway and retrieved Montgomery, who was still handcuffed and detained in the hallway. The agents then directed Montgomery back into the apartment and placed him on the couch in the living room. Montgomery remained handcuffed, but the agents moved the handcuffs from the back to the front. At some point, Montgomery was moved to the kitchen. He asked why he was still handcuffed and the agents responded that it "was for his own safety."

Eventually, Montgomery was asked to sign a form consenting to a search of his apartment. Prior to handing him the form, Agent Kovach told Montgomery that if he did not sign it, ATF could obtain a search warrant. Agent Kovach proceeded to read from the form, which indicates that an individual is not required to consent to a search. After reviewing the form for 30 to 45 seconds,

Montgomery signed it. He remained in handcuffs throughout this time. Altogether, about ten minutes had elapsed since Montgomery was detained.

In the meantime, additional law enforcement officers arrived, including a K-9 unit. The officers proceeded to search the apartment more thoroughly. No testimony was presented as to whether any additional evidence was found pursuant to this search. While the search progressed, Montgomery was questioned about the firearms purchase, drug use, and the firearms application. No *Miranda* warnings were given, and in response to Agent Kovach's inquiries, Montgomery made a number of statements before declining to answer any further questions. Montgomery remained in handcuffs and detained in the kitchen throughout the questioning and the search. After the search and the questioning ended, Montgomery was released and the ATF agents left.

## II.        Discussion

Montgomery seeks to suppress all evidence, including both statements and physical evidence, seized following his detention at his home and the search of his home by ATF agents on December 12, 2007. The government asserts that the evidence was lawfully obtained, arguing that the seizure of Montgomery was justified as an investigatory detention supported by reasonable suspicion, *see Terry v. Ohio*, 392 U.S. 1 (1968), or in the alternative, an arrest supported by probable cause. The government further asserts that the search of the apartment was a permissible "protective sweep," which yielded contraband in plain view.

The Fourth Amendment guarantees the right to be free from unreasonable searches and seizures. U.S. Const. amend. IV. Fundamental to that

protection is the integrity of the home. "In terms that apply equally to seizures of property and to seizures of persons, the Fourth Amendment has drawn a firm line at the entrance to the house. Absent exigent circumstances, that threshold may not reasonably be crossed without a warrant." *Payton v. New York*, 445 U.S. 573, 590 (1980); *see also United States v. Acosta*, 965 F.2d 1248, 1251 (3d Cir. 1992). The Supreme Court has interpreted exigent circumstances narrowly, holding that "a warrantless intrusion may be justified by hot pursuit of a fleeing felon, or imminent destruction of evidence, . . . or the need to prevent a suspect's escape, or the risk of danger to the police or to other persons inside or outside the dwelling." *Minnesota v. Olson*, 495 U.S. 91, 100 (1990) (internal quotations omitted). The government bears the burden of proving the existence of exigent circumstances to justify a warrantless arrest in the home. *Welsh v. Wisconsin*, 466 U.S. 740, 750 (1984); *Sharrar v. Felsing*, 128 F.3d 810, 820 (1997), *abrogated on other grounds by Curley v. Klem*, 499 F.3d 199, 209–10 (3d Cir. 2007).

    Here, the undisputed evidence establishes that law enforcement officers extracted Otis Montgomery from his home,[2] handcuffed and detained him, and then proceeded to search his home—all without obtaining a warrant. The government

---

[2] In their briefs and at oral argument the parties did not address the significance of the location of Montgomery's seizure. However, the undisputed evidence establishes that armed federal agents remained on the premises of the apartment for at least two hours following Green's arrest. While two of the agents were stationed outside his apartment door, Montgomery knocked and requested to surrender or give up. Thereafter, he was instructed on how to exit the apartment. After opening the door and crossing the threshold, he was handcuffed at gunpoint. A reasonable person under these circumstances would not have felt free to leave. *See, e.g.*, *Sharrar*, 128 F.3d at 219–20 (holding that an individual was seized in the home where a SWAT team surrounded the home and ordered the occupants out); *see also United States v. Al-Azzawy*, 784 F.2d 890, 893 (9th Cir. 1985) (holding that an arrest occurred inside a suspect's home where the home was surrounded by police with their weapons drawn and the suspect ordered to leave), *cert. denied*, 476 U.S. 1144 (1986). For the purpose of the Fourth Amendment, under these circumstances Montgomery was seized in his home, not a public place.

has not satisfied its burden of establishing any exigent circumstances justifying the search.  Moreover, the agents did not seek Montgomery's consent until after the search had been performed and the physical evidence now at issue seized.  Accordingly, this case presents a clear *Payton* violation.  *Payton*, 445 U.S. at 590.

> The government attempts to justify the seizure as an investigatory detention, and the search as a "protective sweep."  However, the law is clear that absent exigent circumstances, law enforcement cannot seize an individual at his home without first obtaining a warrant.  *Payton* made clear that such a seizure is unconstitutional regardless of the existence of probable cause, even for a serious felony.  The government offers no support for its contention that a lesser degree of restraint of an individual at his home is permissible.  In *Terry v. Ohio*, the Supreme Court carved out a narrow exception to the warrant requirement to permit law enforcement to conduct a brief, on the street detention of a suspect if there is reasonable suspicion to believe that criminal activity is afoot.  392 U.S. at 21–22.  *Terry* applied only to brief, on the street encounters, and does not permit the seizure of an individual at his own home.  Montgomery's seizure was unconstitutional.

> Nor can the subsequent search of Montgomery's apartment be justified as a protective sweep.  In *Maryland v. Buie*, the Supreme Court held that police may conduct a protective sweep—"a quick and limited search of premises" that is "narrowly confined to a cursory visual inspection of those places in which a person might be hiding"—incident to a lawful arrest.  494 U.S. 325, 328 (1990).  Such a search is only permitted, however, "if the searching officer possessed a reasonable belief based on specific and articulable facts which, taken together with the rational inferences from those facts, reasonably warranted the officer in believing that the

area swept harbored an individual posing a danger to the officer or others." *Id.* at 334; *Sharrar*, 128 F.3d at 822–23.  Here, *Buie* is inapplicable because the seizure was clearly unlawful—as noted above, the agents violated *Payton* when they seized Montgomery at his home without a warrant and in the absence of exigent circumstances.

Moreover, even if the seizure had been lawful, the scope of the search performed by the agents in this case exceeded the limits of a permissible protective sweep.  A protective sweep is limited to a cursory visual inspection of those places where an individual posing a danger to those on the arrest scene may launch an attack.  *Buie*, 494 U.S. at 335–36; *Sharrar*, 128 F.3d at 823.  According to Agent Guyer, the search was necessary to be certain that there were no threats in the apartment, such as other individuals or weapons in plain view.  Agent Kovach testified that the agents suspected that the other unknown individual who had accompanied Montgomery to Gander Mountain may have been in the apartment and armed.  However, five days had elapsed since the purchase at Gander Mountain, and the agents had not observed any other individuals entering or exiting Montgomery's apartment during the two and half hour surveillance of the building.

Additionally, the agents entered the home to conduct the sweep only *after* Montgomery had been extracted from the apartment, and while he remained detained in handcuffs in the foyer.  In other words, the agents left a safe space (the foyer) to enter an allegedly threatening place (the apartment).  There were numerous other options available to the agents to ensure their security short of entering the apartment.  The agents could have interviewed Montgomery in the foyer, which had already been secured by the agents, or outside the apartment building.  The agents

could also have requested that Montgomery accompany them to a police station for questioning.  Finally, if the agents were satisfied that they had probable cause to believe Montgomery had committed an offense, they could have sought an arrest warrant from a detached and neutral magistrate.  Instead, after having secured the scene by seizing and handcuffing Montgomery in the foyer, the agents chose to enter Montgomery's apartment to conduct a search, and thus exceeded the scope of the limited security sweep contemplated by *Buie*.  Under these circumstances, not only was the seizure of Montgomery unlawful, but the subsequent search of his apartment was unconstitutional as well.

The appropriate remedy for a violation of the Fourth Amendment is exclusion of the unlawfully obtained evidence from trial.  *Mapp v. Ohio*, 367 U.S. 643, 654–55 (1961).  This exclusionary rule applies not only to physical evidence seized, but also to verbal statements which are the product of an unlawful seizure.  *Wong Sun v. United States*, 371 U.S. 471, 484–85 (1963); *see also Brown v. Illinois*, 422 U.S. 590 (1975).  Accordingly, all evidence that is the product of Montgomery's unlawful detention, and the unlawful search of his home must be suppressed.  *See New York v. Harris*, 495 U.S. 14 (1990).  Montgomery's verbal statement in the foyer was the product of the unlawful detention because it occurred after he had been extracted from his apartment at gunpoint and handcuffed.  The statements made in the kitchen must be suppressed because they occurred as Montgomery was unlawfully detained in handcuffs in his home.  Finally, the physical evidence seized

10

during the unconsensual and warrantless sweep of Montgomery's apartment must be suppressed as the product of an unconstitutional search.[3]

### III. Conclusion

For the foregoing reasons, Montgomery's motion to suppress is granted. The physical evidence and verbal statements obtained during the unconstitutional search and seizure on December 12, 2007 are inadmissible against Montgomery at trial. An appropriate order will issue.

s/Sylvia H. Rambo<br>
SYLVIA H. RAMBO<br>
United States District Judge

Dated: October 22, 2008.

---

[3] Montgomery further argues that the evidence should be suppressed because he did not voluntarily consent to the officer's search of his home, and that the statements he made were obtained in violation of the Fifth Amendment. The parties dispute whether consent was voluntarily given, and whether Montgomery was subjected to custodial interrogation without prior *Miranda* warnings. The court need not reach these issues. As discussed above, the challenged physical evidence was obtained prior to Montgomery's alleged consent, and the statements made were the fruit of an illegal seizure. Accordingly, it is not necessary to reach the issue of whether Montgomery's consent was voluntary, or the statements obtained in violation of the Fifth Amendment.

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **Criminal No. 1:08-CR-0041** |
| **v.** | : | **JUDGE SYLVIA H. RAMBO** |
| **OTIS MONTGOMERY** | : | |

# O R D E R

In accordance with the foregoing memorandum of law, **IT IS HEREBY ORDERED THAT** Defendant Otis Montgomery's motion to suppress (Doc. 30) is **GRANTED**. The physical evidence seized and statements made by Otis Montgomery on December 12, 2007 shall be inadmissible against him at trial.

                                                                     s/Sylvia H. Rambo
                                                                      SYLVIA H. RAMBO
                                                                      United States District Judge

Dated: October 22, 2008.